**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **TRACEY BERNIER; LUKE HARRIS; ERIC GRAMLICH; H.P. WOOD FARMS LLC; CHESTER HANSCOM; DANNY SLANEY; DEBRA KENNEY; and BARBARA KENNEY,**<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY and BASF CORPORATION,<br><br>Defendants. | **Civil Action No.**<br><br>**COMPLAINT**<br>**AND**<br>**JURY DEMAND** |

**COMPLAINT AND JURY DEMAND**

Plaintiffs Tracey Bernier, Luke Harris, Eric Gramlich, H.P. Wood Farms LLC, Chester Hanscom, Danny Slaney, Debra Kenney, and Barbara Kenney file this Complaint against Defendants 3M Company and BASF Corporation and allege as follows:

**INTRODUCTION**

1. This is a property-contamination action arising from Defendants' manufacture, formulation, sale, and distribution of PFAS-containing and PFAS-precursor products for use in grease- and water-resistant molded paper products manufactured at the paper mill now operated by Huhtamaki, Inc. in Waterville, Maine (the "Mill").

2. The products at issue are 3M's FC-807 and, to a lesser extent, FC-850, also sold under the Scotchban name; and Ciba/BASF's Lodyne P-201, a paper-treatment product formulated from or based on DuPont Telomer B materials.

3. 3M sold FC-807 and other paper chemicals for use at the Mill. Ciba/BASF sold Lodyne P-201 and other paper chemicals for use at the Mill.

4. The PFAS in these products did not cease to be hazardous when the products were used as intended. The intended manufacturing and subsequent environmental processes left persistent PFAS in wastewater, sludge, residual fibers, and other byproducts and transformed fluorotelomer precursors into terminal perfluoroalkyl acids, including PFOA and related perfluoroalkyl carboxylic acids. Even when used as intended, PFAS-based paper treatment products were present in process waste and effluent generated at the mill and channeled to a WWTP and left the WWTP in liquid effluent or incorporated into sludge. While some of the PFAS products may have been transformed during this process, the transformation was toward generation of terminal PFAS compounds including PFOS and PFOA and related perfluoroalkyl acid.

5. Defendants knew or should have known that the paper treatment products, when used as intended, would introduce persistent PFAS into the Mill's process waste including into process effluent. Defendants also knew or should have known that conventional wastewater treatment processes, sludge handling, composting, or land application would not mineralize or fully degrade the carbon-fluorine backbone or render the resulting PFAS less persistent.

6. Defendants did not provide Huhtamaki or its predecessors with adequate warnings concerning the products' PFAS content, the presence of PFAS contaminants or precursors, the formation of terminal PFAS during intended use and environmental transformation, the persistence and mobility of the resulting PFAS, or the need to contain the Mill's resulting wastewater and residuals and prevent their land application. Defendants did not provide Huhtamaki or predecessors with adequate warnings concerning the persistence, toxicity, or bioaccumulation- and environmental mobility-potential of the PFAS present in paper-treatment

products or for the expected breakdown products of the PFAS-based active ingredients, impurities or degradation products.

7. Huhtamaki was misled or uninformed by the chemical suppliers about the persistence, bioaccumulation potential and toxicity, and the likely environmental fate of the PFAS components of FC-807 (FC-850) and Lodyne P-201. Huhtamaki is therefore not named as a defendant in this action.

8. The principal contamination pathway alleged here was: (a) 3M and Ciba/BASF supplied PFAS-containing paper-treatment products to the Mill; (b) the Mill used those products as intended; (c) PFAS-containing wastewater - entered the Kennebec Sanitary Treatment District ("KSTD") system; and (d) PFAS-containing sludge and biosolids produced at KSTD as a result of treating process waste that included PFAS from Huhtamaki were applied to agricultural fields on, near, or hydrologically connected to Plaintiffs' properties.

9. Plaintiffs do not allege that every PFAS molecule applied to every field came directly from the Mill, nor that every PFAS molecule originated in Mill residuals, nor that PFAS present in every field followed an identical route from mill to groundwater. Plaintiffs allege that the PFAS originating from Defendants' paper-treatment products traveled through the KSTD land-application pathway, and possibly other pathways, constitutes that vast majority of the PFAS pollution contaminating Plaintiffs’ properties.

10. Plaintiffs seek only damages for investigation and remediation of their physically contaminated properties and for loss of use and enjoyment of those properties. Plaintiffs do not seek damages in this action for personal injury, medical monitoring, or diminution in market value.

## PARTIES

11. Plaintiff Tracey Bernier is a citizen of Maine and owns and occupies approximately one acre of residential property located at 165 River Road in Benton, Maine, which is served by a private well and includes three gardens, apple trees, grapevines, and raspberry and blackberry bushes. PFAS testing has been conducted on the property, causing Bernier to lose the use and enjoyment of homegrown fruits grown there. The property is located along the River Road corridor approximately one mile from the Woodworth Site, where the Kennebec Sanitary Treatment District was licensed in 1993 to spread lime-stabilized wastewater-treatment sludge on a 155-acre field and maintain two sludge-stockpiling areas.

12. Plaintiff Luke Harris is a citizen of Maine and owns and occupies approximately 3.4 acres of property located at 570 Skowhegan Road in Fairfield, Maine, which is served by a private drilled well. His property is located within approximately one-half mile of multiple fields identified by the Maine DEP as part of the Ohio Hill Road-Fairfield sludge-utilization site.

13. Plaintiff Eric Gramlich is a citizen of Maine and owns and occupies approximately 25.94 acres of property located at 24 Six Rod Road in Fairfield, Maine, which is served by a private drilled well. His property is located approximately one-eighth of a mile from multiple licensed sludge-application fields associated with the Mackay & Wood Site 2, where the Kennebec Sanitary Treatment District was licensed in 1996 to apply lime-stabilized wastewater-treatment sludge and maintain three sludge-stockpiling areas on each licensed field.

14. Plaintiff H.P. Wood Farms LLC ("HP Wood") is a Maine limited liability company whose members are residents of Maine and/or Arizona. HP Wood owns multiple agricultural, wooded, and residential parcels in Fairfield, Maine, including approximately 430 acres assessed at 91 Ohio Hill Road–TG and additional property at 103 and 116 Ohio Hill Road. The HP Wood's property includes farmland in the Joy Road and Ridge Road area historically

leased for corn production and wooded land containing two brooks used for hunting and fishing. Maine DEP records show that portions of the property overlap the H.P. Wood Site, where the Kennebec Sanitary Treatment District was authorized under Program Approval No. S-020127-62-A-N to spread sludge. State testing has confirmed PFAS contamination of both the soil and water, preventing the LLC from leasing the fields for corn production or using the property for farming, hunting, and fishing.

15. Plaintiff Chester Hanscom is a citizen of Maine and owns and occupies approximately 2.5 acres of residential property located at 15 Currier Road in Fairfield, Maine, where he has resided since 2015 and which is served by a private drilled well. His property is immediately adjacent to, and approximately 150 feet from, multiple fields identified by the Maine DEP as part of the Ohio Hill Road-Fairfield sludge-utilization site, resulting in loss of use and enjoyment.

16. Plaintiff Danny Slaney is a citizen of Maine and owns and occupies residential property located at 378 Center Road, together with adjoining land, in Fairfield, Maine. His family has used the properties since the early 1970s, and the properties include gardens, wooded land, Fish Brook, and other surrounding waterways. Testing found PFAS contamination in the properties' soil and surrounding waterways, preventing the family from gardening, hunting, and fishing. The properties are located approximately four-tenths of a mile from licensed sludge-application fields associated with the Mackay & Wood Site 2.

17. Plaintiff Debra Kenney is a citizen of Maine and owns residential and agricultural property located at 299 Ohio Hill Road and on related parcels in Fairfield, Maine, including a private well, a single-family residence, forested land, and open fields historically used by the Tozier family for agricultural crops. Maine DEP testing confirmed PFAS contamination on the

properties, which are immediately adjacent to licensed sludge-application fields associated with the Tozier Site 3. The contamination has restricted farming, impaired recreational use, and placed the properties within Maine's "Do Not Eat" wildlife advisory area.

18. Plaintiff Barbara Kenney is a citizen of Maine and owns and occupies approximately 4.13 acres of property located at 39 Howe Road in Fairfield, Maine. Maine DEP mapping indicates that her property overlaps a licensed sludge-application field associated with the Tozier Site 3, which was part of an approximately 87.75-acre sludge-utilization operation licensed to the Kennebec Sanitary Treatment District in 1992 and expanded by an additional 53.4 acres in 1994.

19. Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business in Minnesota. 3M designed, manufactured, marketed, and sold FC-807 and other PFAS-containing products for use in paper manufacturing, including at the Mill.

20. Defendant BASF Corporation ("BASF") is a New Jersey corporation with its principal place of business in Florham Park, New Jersey. BASF acquired Ciba in approximately 2008 and is alleged to be the successor to Ciba's liabilities associated with Lodyne P-201.

21. Ciba and BASF are referred to collectively as "Ciba/BASF" when the allegations concern Lodyne P-201 activities occurring before and after BASF's acquisition of Ciba. 3M and BASF are referred to collectively as "Defendants."

## JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). The individual Plaintiffs are citizens of Maine and/or Arizona. Neither Defendant is a citizen of Maine or Arizona.

23. The amount in controversy exceeds $75,000, exclusive of interest and costs, as to each Plaintiff, based on the reasonable cost to investigate and remediate physical PFAS contamination and the resulting loss of use and enjoyment. The remaining Plaintiffs' claims form part of the same Article III case or controversy, and the Court has supplemental jurisdiction over any claim requiring it under 28 U.S.C. § 1367.

24. Venue is proper in the District of Maine under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in Maine and the contaminated properties are located in Maine.

25. The properties at issue are located in Kennebec and Somerset Counties. Under District of Maine Local Rule 3(h), the action ordinarily would be tried in Bangor.

## FACTUAL ALLEGATIONS

### I. PFAS Chemistry, Persistence, and Regulatory Benchmarks

26. PFAS are a large family of synthetic chemicals containing at least one fully fluorinated carbon atom. The carbon-fluorine bond is exceptionally strong, causing PFAS to resist complete degradation by hydrolysis, photolysis, biodegradation, microbial processes or conventional wastewater treatment. The terminal degradation product of many PFAS is a perfluorinated alkyl acid (PFAA).

27. Some PFAS present in surface-treatment products as active ingredients, degradation products or impurities are terminal perfluoroalkyl acids, such as PFOA and PFOS. Others are polyfluorinated compounds, including fluorotelomer-based substances, that can transform through various processes to PFAAs. Other are perfluorinated sulfonyl-based compounds, including alcohols, acids or phosphate esters, that can transform by various processes to PFAAs.

28. Calling a fluorotelomer compound or a perfluorosulfonyl compound a "precursor" does not make it environmentally benign. The nonfluorinated portion of a fluorotelomer or a perfluorsulfonyl can be degraded leavind a per- or polyfluorinated compound of a terminal PFAA. PFAS products may also contain unreacted PFAS feedstocks, PFAS degradation products, PFAS processes impurities or PFAS manufacturing byproducts. Any or all of these components follow the same route from process waste to biosolid incorporation into agricultural fields.

29. PFAS do not need to remain in the precise commercial formulation in which they were sold to retain their characteristics of persistence, bioaccumulation, environmental mobility or toxicity. PFAS products, unreacted PFAS feedstocks, PFAS degradation products, PFAS processes impurities or PFAS manufacturing byproducts can persist through paper manufacturing, wastewater treatment, sludge handling, composting, land application, soil transport, surface water transport and groundwater transport.

30. Wastewater treatment plants are designed primarily to remove solids, biodegradable organic matter, nutrients, and pathogens. Conventional waste water treatment is not designed to cleave the carbon-fluorine bond characteristic of all PFAS. Waste water treatment processes can redistribute PFAS between effluent and solids and can degrade or partially degrade the non-PFAS component of a molecule, leaving a terminal PFAA or a more stable PFAS.

31. During sludge treatment and composting, some PFAS preferentially associate with solids, while other PFAS remain mobile in porewater and leachate. Mixing PFAS-contaminated sludge with other waste does not destroy PFAS.

32. The two principal historic PFAS-manufacturing processes leave analytically distinguishable signatures. Electrochemical fluorination ("ECF") produces perfluorinated compounds including perfluorosulfonyl and perfluorinate carboxylic acids in mixtures of branched and linear perfluorinated isomers. Fluorotelomerization generally produces linear isomers fluorotelomer compounds and corresponding linear isomers of per- or polyfluorinated transformation products such as PFOA. Fluortelomerization cannot be used to produce perfluorinated sulfonyl compounds, including PFOS. These differences permit source attribution using the molecular identity, chain-length distribution, intermediate compounds, and isomer profiles detected in environmental samples.

33. FC-807's principal active component, diSAmPAP, can transform through a cascade that includes EtFOSE, EtFOSAA, EtFOSA, FOSA, and ultimately PFOS. Detection of intact diSAmPAP provides product-specific evidence of FC-807, while the accompanying intermediate and terminal compounds provide a chemically coherent FC-807 fingerprint even after years of transformation and transport.

34. Lodyne P-201 contains two fluorotelomer chains and was manufactured from Telomer B or Telomer BN containing a distribution of chain lengths. Environmental transformation of P-201 and its raw-material and process impurities can produce fluorotelomer sulfonates, including 8:2 FTS and 10:2 FTS, fluorotelomer alcohol intermediates, and a ladder of persistent perfluoroalkyl carboxylic acids extending through long-chain compounds such as PFDA, PFUnA, PFDoA, PFTrDA, and PFTeDA.

35. After land application, PFAS can leach from soil into groundwater, move with runoff or drainage or wind or erosion to adjacent property, and migrate through aquifers. The rate and direction of migration vary with compound, chain length, functional group, soil organic

carbon, mineralogy, pH, hydrology, precursor transformation, and site-specific application history.

36. PFAS bound to soil and biosolid particles can also move beyond an application site through wind-blown dust, erosion, tilling, flooding, and surface-water runoff. Longer-chain PFAS tend to associate more strongly with soil and organic matter, creating a slowly depleted source reservoir that can continue releasing more-mobile compounds to groundwater and adjoining land over time.

37. The combination of intact diSAmPAP, FC-807-specific intermediates, 8:2 and 10:2 fluorotelomer sulfonates, and an elevated long-chain PFCA ladder is materially different from diffuse background PFAS and from the profile expected from ordinary municipal wastewater or AFFF (aka firefighting foam).

38. In 2025, Maine enacted 22 M.R.S. § 2650-A, which adopts the maximum contaminant levels contained in the federal PFAS drinking-water rule as promulgated on April 26, 2024, and specifies that those standards are not superseded by later versions of the federal rule. Those adopted levels include 4 parts per trillion for PFOA and PFOS, 10 parts per trillion for PFHxS, PFNA, and HFPO-DA, and a hazard-index limit for specified mixtures.

39. The public-water standards do not define the full scope of injury to a private property and are not pleaded as a regulatory limit directly governing every private well. They demonstrate, however, that treatment and risk-management decisions are required at extraordinarily low PFAS concentrations.

## II. 3M, FC-807, and 3M's Knowledge

40. 3M developed and sold FC-807, also known as Scotchban, as a fluorochemical treatment intended to impart grease, oil, and water resistance to paper and molded-fiber

products. FC-807 was 3M's principal paper-and-packaging protection product from approximately 1974 until 3M discontinued it in 2002.

41. FC-807 was a mixture of mono-, di-, and tri-phosphate esters of EtFOSE. Its major component, comprising approximately 81% to 86% of the product, was the diester diSAmPAP. FC-807 also contained EtFOSE, EtFOSA, PFOS, FOSA, and other PFAS as raw-material or process impurities.

42. 3M supplied FC-807 for use at the Mill beginning in approximately 1970 and continuing, with some interruptions, until the product was discontinued. 3M knew the intended manufacturing process and knew that some portion of the treatment chemical would not remain permanently bound in finished paper products but would instead enter wastewater, fiber residuals, sludge, and other byproducts.

43. In 1997 and 1998, 3M estimated that paper mills and other supply-chain processors using Scotchban products lost approximately 16,000 pounds per year of PFOS equivalents to wastewater. Those estimated losses represented approximately 14% to 15% of the PFOS-equivalent releases from supply-chain processing across 3M's PFOS-based businesses.

44. As early as 1971, 3M scientists documented that biological treatment could decompose the hydrocarbon portions of fluorochemical surfactants and fiber treatments while leaving non-biodegradable perfluoroalkyl carboxylic or sulfonic acids. 3M further recognized that the remaining fluorochemical acids would adsorb to soil.

45. By 1976 through 1978, 3M studies had demonstrated that FC-807 and its EtFOSE chemistry metabolized to PFOS. In 1978, a 3M scientist recorded that PFOS formed from FC-807 or EtFOSE accumulated in animal blood and tissue.

46. In 1978, 3M tested PFAS-containing waste that had passed through wastewater treatment at its Decatur, Alabama facility. The sludge contained approximately 730 parts per million organic fluorine, compared with approximately 10.9 parts per million in treated effluent. EtFOSE, EtFOSAA, EtFOSA, and related compounds associated with FC-807 were identified in that post-treatment waste stream.

47. A separate 1978 activated-sludge study showed that PFOS and PFOA were completely resistant to biodegradation over the study period. By 1980, 3M therefore possessed field and laboratory data showing that conventional wastewater treatment did not destroy its fluorochemicals and that treated effluent and land-incorporated sludge were routes of environmental release.

48. By 1979 and 1980, 3M had evidence that PFOS, EtFOSE, and related compounds were persistent, bioaccumulative, and toxic. Its animal studies produced liver and gastrointestinal effects and led its own toxicologists to regard the tested compounds as toxic.

49. In 1983, a senior 3M environmental scientist specifically warned that microbial conversion could occur in fish or food crops grown in soil containing fluorochemical wastewater sludge and proposed research to estimate the environmental risk of sludge-soil incorporation. 3M did not timely complete or disclose the proposed work.

50. In 1988, the same scientist recorded that additional biodegradation testing had been refused in part because the results were considered certain to show that the fluorochemical surfactants were not biodegradable and the business saw no benefit in generating that negative data.

51. By the time 3M sold FC-807 for use at the Mill, 3M thus knew or should have known that uncontained wastewater and residuals containing its fluorochemicals could

contaminate soil, sludge, groundwater, aquifers, drinking-water wells, and nearby property. It also knew that FC-807's precursor reservoir could continue generating PFOS after disposal.

52. 3M nevertheless failed to give Huhtamaki or its predecessors an adequate warning that FC-807 contained PFAS or PFAS precursors that would persist in process residuals; that conventional wastewater treatment would not destroy them; that land application of resulting sludge would create long-term soil and groundwater contamination; or that the residuals required containment and a disposal method designed for persistent fluorochemicals.

53. 3M's communications and omissions instead left the Mill operator without the information reasonably necessary to select a safer alternative, segregate affected wastewater, prevent land application, require destructive treatment where available, or otherwise prevent off-site contamination.

**III. DuPont's Telomer B and Telomer BN**

54. DuPont developed, manufactured, and sold fluorotelomer feedstocks identified as Telomer B and Telomer BN.

55. Telomer B and Telomer BN contained polyfluorinated precursor substances and residual terminal PFAS or PFAS-forming contaminants arising from their manufacture. Their intended downstream use did not eliminate the per- or poly-fluorinated chains responsible for persistence and environmental harm.

56. Telomer BN meant Telomer B "new" and was formulated with fewer C6 chains and a greater proportion of longer C8, C10, C12, and C14 fluorotelomer chains than DuPont's ordinary Telomer B distribution. Internal product information described a distribution of approximately 1.5% C6, 39% C8, 36% C10, 16% C12, and 5% C14 chains.

57. Ciba's later product-stewardship analysis determined that PFOA, PFDA, and PFDoA in Lodyne P-201 were largely carried through from DuPont's Telomer BN raw material. The finished P-201 product contained approximately 20 parts per million PFOA, 12 parts per million PFDA, and 5 parts per million PFDoA, confirming that DuPont supplied terminal PFCA contaminants as well as PFCA-forming precursors.

58. A published 1981 study demonstrated that fluorotelomer alcohols transform metabolically into corresponding persistent PFCAs such as PFOA. The study was available during the period in which BASF used Telomer B and Telomer BN to make P-201 and when P-201 was being sold for use at the Mill. A similar study was published in 1983.

59. In September 2002, the Telomer Research Program consortium received research confirming that fluorotelomer alcohols degraded into PFCAs under both biological degradation and atmospheric oxidation conditions. This confirmation was received before P-201 was fully phased out at the Mill.

## IV. Ciba/BASF and Lodyne P-201

60. Ciba developed, formulated, manufactured, marketed, and sold Lodyne P-201 as a paper-treatment product no later than the early 1980s. Lodyne P-201 was formulated from DuPont Telomer B or Telomer BN materials and was sold for use at the Mill.

61. Each Lodyne P-201 molecule contained two fluorotelomer chains. The Telomer BN raw-material distribution caused P-201 to be enriched in C8, C10, C12, and C14 homologues, with some Ciba information recognizing chains as long as C20.

62. In addition to the intended P-201 diadduct, the product contained fluorotelomer monoadduct and disulfide process impurities. Environmental transformation of the intended

product and these impurities can yield multiple fluorotelomer intermediates and persistent PFCAs per molecule.

63. Ciba/BASF knew the purpose for which Lodyne P-201 was sold, knew how the Mill would apply the product, and knew or should have known that a portion of the product and its PFAS constituents or transformation products would enter wastewater, sludge, fiber residuals, and other byproducts.

64. As a formulator and commercial seller, Ciba/BASF had access to the product formulation, raw-material specifications, analytical methods, product-stewardship information, and the intended downstream process. Reasonable testing and product stewardship would have disclosed the presence, persistence, or formation of PFAS in the product and resulting residuals.

65. Ciba's own later product-stewardship records confirmed that DuPont's Telomer BN carried PFOA, PFDA, and PFDoA into P-201 and quantified those terminal PFCA contaminants in the finished product. Those findings were consistent with the raw-material composition and hazards that reasonable testing during the sales period would have disclosed.

66. By 1981, published research had demonstrated that fluorotelomer alcohols could transform to persistent PFCAs. A competent fluorochemical formulator in the 1980s and 1990s knew or should have predicted that intended use, wastewater treatment, and environmental weathering of P-201's fluorotelomer chains would generate persistent PFCAs.

67. Despite P-201's intended use in a water-intensive paper process and the predictable discharge of product losses to wastewater, no adequate compound-specific environmental-degradation study or waste-disposal instruction for P-201 has been identified. Ciba/BASF failed to test the product adequately for its foreseeable wastewater, sludge, compost, soil, and groundwater fate.

68. Ciba continued selling P-201 into the period of KSTD biosolids application. It did not begin phasing out P-201 until approximately 2002, and an internal plan targeted conversion of the Mill from P-201 to another Lodyne product by the end of the first quarter of 2003.

69. On information and belief, Ciba/BASF either knew that Lodyne P-201 contained or generated persistent PFAS under intended and foreseeable conditions, or it failed to exercise reasonable care to learn facts that a competent fluorochemical formulator and supplier should have known.

70. Ciba/BASF failed to warn the Mill operator that Lodyne P-201 contained fluorotelomer substances and/or PFAS contaminants that would persist or transform into terminal PFAS; that conventional wastewater treatment would not destroy them; and that wastewater and residuals required containment and should not be converted into land-applied sludge or biosolids.

71. Plaintiffs do not presently possess all communications, specifications, analytical data, and product-stewardship records exchanged among DuPont, Ciba/BASF, and the Mill. Those records are principally within Ciba/BASF's possession and will bear on Ciba/BASF's knowledge of Lodyne P-201's composition, environmental fate, and downstream waste-management hazards.

**V. Intended Use at the Mill and the Missing Warnings**

72. The Mill used FC-807 and Lodyne P-201 for the uses for which Defendants marketed and sold them: imparting oil-, grease-, and water-resistant properties to molded paper or fiber products.

73. Records reflect that the Mill used FC-807 beginning in approximately 1970 and P-201 beginning in the early 1980s. For at least a decade, the Mill used both products during the

same period, creating a combined industrial waste stream containing both ECF-based and fluorotelomer-based PFAS chemistry. For a limited time in the relevant period the Mill used FC-850.

74. During the approximately 1981-to-2003 biosolids-spreading period, the Mill purchased or used more than 250,000 pounds per year of PFAS-based pulp-treatment products and more than 5.5 million pounds in total, with FC-807 and P-201 as the dominant PFAS chemistries.

75. The PFAS-based treatment products were formulated at approximately 33% to 35% PFAS solids by weight. A Mill corporate representative testified that approximately 1% of the purchased treatment product was lost to process effluent during molded-pulp manufacturing.

76. Defendants maintained commercial and technical relationships with their customers and knew or should have known that these treatments were applied in water-intensive paper-manufacturing processes that generated wastewater, sludge, residual fibers, and other byproducts.

77. The Mill's intended use predictably produced byproducts and residuals containing the PFAS originally present in FC-807 and Lodyne P-201, PFAS present as contaminants in those products or upstream ingredients, and terminal PFAS formed from precursor transformation.

78. The Mill operator did not receive an adequate warning that ordinary sewer discharge, conventional wastewater treatment, composting, or land application would not destroy these substances and would instead create a long-lived contamination source.

79. Had adequate warnings been provided, the Mill operator would have used available safer alternatives, refused the products, required its suppliers to provide PFAS-free

formulations, segregated and contained affected wastewater, prevented the affected solids from being land applied, and/or selected a disposal or treatment method designed to prevent PFAS release.

80. A sophisticated industrial operator cannot act on hazards and waste-management requirements that its chemical suppliers concealed, misstated, or failed to disclose. The warnings required here concerned information that was in Defendants' possession or expertise and was not open and obvious to the downstream user during the relevant periods.

81. The failure to warn was therefore a substantial factor in the creation of PFAS-contaminated wastewater and residuals and in the subsequent release of those materials into KSTD's treatment and sludge-management system.

## VI. The KSTD Direct Land-Application Pathway

82. The Mill discharged PFAS-containing wastewater to KSTD. During the 1981-to-2003 period, the Mill was KSTD's largest single contributor of wastewater influent.

83. KSTD's conventional treatment processes did not destroy the PFAS and PFAS precursors derived from FC-807 and Lodyne P-201. Some compounds remained in treated water; others partitioned into or became associated with sludge and biosolids; and some precursors transformed into measurable terminal PFAS.

84. Maine records indicate that KSTD generated approximately 285,000 cubic yards of biosolids between 1981 and 2003. Approximately 147,000 cubic yards of KSTD biosolids were spread in Fairfield, including approximately 110,000 cubic yards applied to the Tozier, Julia, and Woods fields near the area in which property contamination has been documented.

85. KSTD generated sludge or biosolids that were transported and applied to agricultural fields in central Maine, including fields on, adjacent to, or hydrologically connected with Plaintiffs' properties.

86. The KSTD-derived material applied to those fields contained PFAS originating in substantial part from products used at the Mill, including FC-807 and Lodyne P-201.

87. A screening-level mass balance based on documented product use and the Mill representative's 1% process-loss testimony estimates that approximately 15,249 pounds of PFOS- and PFCA-equivalent mass left the Mill for KSTD during the relevant period. Even materially reducing the assumed process loss or sludge partitioning produces a load sufficient to account for the order of magnitude measured in Fairfield soils after decades of dilution, weathering, runoff, leaching, and particle transport.

88. The mass-balance calculation is not pleaded as an allocation of every PFAS molecule or as proof that every KSTD load contained the same concentration. It is pleaded as an independent plausibility check demonstrating that documented use and ordinary process loss of FC-807 and P-201 could supply the measured regional contamination.

89. Maine DEP sampling at 26 Fairfield sludge-utilization locations found that 25 shared high concentrations and compound patterns characteristic of industrial paper-mill biosolids. Ten of the 26 locations contained PFOS above 500 parts per billion, and all but three contained PFOS above 150 parts per billion even though the sampled material had been mixed with soil and weathered for decades.

90. Targeted sampling in 2026 detected intact diSAmPAP, FC-807's principal active ingredient, in every one of nine samples collected across the Tozier, Woods, and Ridge fields. Concentrations ranged from approximately 19 to 1,119 parts per billion. Because diSAmPAP is

the commercial product component rather than a degradation product, its presence supplies product-specific evidence that FC-807 entered the KSTD sludge applied to those fields.

91. The same samples contained the expected FC-807 degradation cascade, including EtFOSE, EtFOSAA, EtFOSA, FOSA, and PFOS. The co-occurrence and relative concentrations of intact product, intermediate compounds, and terminal PFOS are chemically consistent with ongoing environmental degradation of FC-807.

92. Sampling also detected 8:2 FTS at 24 of the 26 DEP locations, 10:2 FTS at nearly every location tested for that compound in 2026, and a PFCA ladder dominated by PFDA and extending through long-chain PFCAs. High-resolution mass spectrometry further identified intact P-201 homologues in Woods Field soil, including 8:2/8:2, 8:2/10:2, and 10:2/10:2 P-201.

93. Supplemental 2026 testing in the Julia fields measured intact diSAmPAP at approximately 545 and 153 parts per billion in two samples, PFOS at approximately 435 and 565 parts per billion, and 10:2 FTS at approximately 225 and 166 parts per billion. Those samples also contained 8:2 FTS and a long-chain PFCA distribution consistent with the same dual product fingerprint.

94. The combined presence of intact FC-807 and P-201 components, product-specific intermediates, terminal PFOS, and an elevated long-chain PFCA ladder forms a dual chemical fingerprint analytically distinguishable from diffuse background contamination, ordinary municipal biosolids, and AFFF as the source.

95. Characteristic compounds at the application sites are as much as three orders of magnitude above levels attributable to diffuse background or ordinary municipal biosolids. The product-use records, KSTD disposal records, field geography, analytical fingerprint, and mass

balance independently converge on the Mill's FC-807 and P-201 waste stream as a substantial source.

96. After land application, PFAS migrated vertically through soil toward groundwater, laterally with groundwater, and through runoff or drainage toward nearby lands and surface waters. PFAS was also spread from the fields by wind. The distribution was heterogeneous, so contamination could be high on one property or in one well and lower on an adjoining property.

97. The detection of intact diSAmPAP and intact P-201 more than two decades after land application ceased demonstrates that a reservoir of unconverted precursor material remains in the spreading fields. That reservoir can continue generating PFOS and PFCAs and releasing them to soil, groundwater, surface water, and nearby property.

## VIII. Contamination and Property Damage

98. PFAS associated with Defendants' products has physically invaded and contaminated Plaintiffs' soil, groundwater, wells, surface water, structures, and/or other property media, as will be specified for each Plaintiff.

99. The contamination is not merely an economic expectancy or a perceived stigma. It is a physical alteration of property that requires investigation, characterization, treatment, removal, replacement, containment, long-term operation and maintenance, and/or monitoring.

100. Plaintiffs have lost and continue to lose the ability to use and enjoy portions of their properties in ordinary ways, including using private well water; growing and consuming garden produce and homegrown fruit; farming or leasing fields for crop production; and hunting, fishing, and other recreational uses.

101. Reasonable remediation may include, depending on the property, replacement water, point-of-entry treatment and maintenance, excavation or management of contaminated soil, decontamination of structures, treatment or replacement of affected water infrastructure, hydraulic or source controls, treatment residual disposal, confirmatory sampling, and long-term monitoring.

102. Regional monitoring and depth-profile data demonstrate that PFAS remain at depth and that intact product precursors remain available for future transformation. Without active remediation of contaminated source material and affected property, there is no scientifically defensible basis to assume that natural attenuation will restore affected wells and soil within a predictable period.

103. The need to investigate and remediate Plaintiffs' own properties is a special and peculiar injury different in kind from the generalized public concern about PFAS in regional water resources.

104. PFAS continue to migrate into, onto and within soil and groundwater and continue to interfere with Plaintiffs' use and enjoyment of their properties. Defendants have not paid the reasonable costs of investigation and remediation and have not compensated Plaintiffs for their loss of use and enjoyment.

105. Plaintiffs commenced this action within six years after their claims accrued under 14 M.R.S. § 752.

## CAUSES OF ACTION

## COUNT I

## NEGLIGENCE - FAILURE TO WARN

106. Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth here.

107. Defendants manufactured, formulated, marketed, supplied, and sold products for industrial use and owed a duty to exercise reasonable care to prevent foreseeable harm to persons and property endangered by the products' probable use.

108. Under Maine law, including the principles reflected in Restatement (Second) of Torts § 388 and 14 M.R.S. § 161, that duty required Defendants to provide users in the supply chain with information reasonably necessary to make the intended use safe for the user and for persons and property in the vicinity of that use.

109. 3M owed a duty to warn the Mill operator of FC-807's PFAS content, precursor and contaminant profile, environmental persistence, transformation products, wastewater and sludge hazards, and need for containment and non-land-application disposal.

110. Ciba/BASF owed a duty to investigate Lodyne P-201's raw materials and environmental fate and to warn the Mill operator of PFAS content, precursor transformation, residual contamination, and the need for containment and appropriate disposal.

111. Defendants breached their respective duties by failing to conduct adequate testing, failing to communicate information already known or reasonably knowable, failing to provide adequate warnings and disposal instructions, continuing sales without corrective warnings, and failing to ensure that the downstream user received the information necessary to prevent PFAS-contaminated residuals from entering KSTD and land-applied sludge.

112. Plaintiffs were foreseeable property owners endangered by the probable and intended use of Defendants' products at a nearby paper mill and by the foreseeable management of the resulting wastewater and sludge.

113. Adequate warnings would have altered the Mill operator's conduct by causing it to select safer products, require PFAS-free formulations, segregate or contain affected wastewater, and prevent affected solids from being land applied. The absence of warnings was a substantial factor in the contamination.

114. Defendants' breaches proximately caused physical PFAS contamination of Plaintiffs' properties and resulting past and future remediation costs and loss of use and enjoyment.

**COUNT II**

**STRICT PRODUCTS LIABILITY - FAILURE TO WARN**

**14 M.R.S. §§ 161 AND 221**

115. Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth here.

116. 3M and Ciba/BASF were engaged in the business of selling FC-807 and Lodyne P-201, respectively.

117. The products were defective and unreasonably dangerous because they were sold without adequate warnings that intended use and foreseeable waste management would leave or form persistent PFAS in wastewater and residuals and that those materials required containment and disposal controls to protect nearby property.

118. Defendants reasonably should have expected the Mill operator to use the products and reasonably should have expected nearby property owners, including Plaintiffs, to be affected if the products were used without the omitted warnings.

119. FC-807 reached the Mill without significant change in the condition in which 3M sold it. Lodyne P-201 manufactured and sold by BASF reached the Mill without an unforeseen significant change.

120. The intended formulation and paper-manufacturing processes did not eliminate or significantly change the essential PFAS hazard. PFAS structures, contaminants, and precursor chains persisted in, or predictably transformed within, wastewater, sludge, soil, and groundwater.

121. The Mill's use, wastewater discharge, KSTD treatment, sludge management, and land application were not unforeseen intervening causes. They were the very downstream processes about which adequate warnings and controls were required.

122. Lack of privity is no defense under 14 M.R.S. §§ 161 and 221 because Plaintiffs and their properties were persons and property Defendants reasonably should have expected to be affected by the goods.

123. The defective warnings proximately caused physical harm to Plaintiffs' properties and resulting past and future remediation costs and loss of use and enjoyment.

## COUNT III

## PRIVATE NUISANCE

124. Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth here.

125. After acquiring knowledge of PFAS persistence, toxicity, waste pathways, and the intended use of their products, Defendants created or continued the condition causing the

interference with knowledge that contamination of soil and water was occurring or was substantially certain to follow from continued uncorrected sales and missing warnings.

126. Defendants participated to a substantial extent in creating and continuing the nuisance by supplying the specific fluorochemical products used at the Mill, advising or supporting their intended use, failing to warn of the resulting wastewater and sludge hazards, and continuing sales despite knowledge of the probable release pathway.

127. PFAS from Defendants' products physically contaminated Plaintiffs' properties and substantially interfered with Plaintiffs' use and enjoyment of their land and water.

128. The interference is substantial because it affects the physical condition of the properties, requires costly remediation, restricts ordinary property uses, and continues for so long as PFAS remain above appropriate remediation goals.

129. The nature, duration, severity, and remediability of the contamination make the interference unreasonable.

130. Defendants' conduct proximately caused Plaintiffs' past and future remediation costs and loss of use and enjoyment.

**COUNT IV**

**PUBLIC NUISANCE**

131. Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth here.

132. Contamination of groundwater, aquifers, and water resources with persistent PFAS unreasonably interferes with rights common to the general public, including the right to waters that are not corrupted, unwholesome, or impure.

133. Defendants created, assisted in creating, and substantially participated in the continuing public nuisance through the conduct alleged above.

134. Plaintiffs have suffered special and peculiar harm different in kind from the general public: physical contamination of their individually owned properties, the personal legal and financial obligation to investigate and remediate those properties, and the loss of specific private uses of those properties.

135. The costs of remediating Plaintiffs' properties and restoring their private use and enjoyment are not merely a greater degree of the generalized public injury. They arise from the physical invasion of particular parcels owned or occupied by Plaintiffs.

136. Defendants' conduct proximately caused Plaintiffs' special injuries, including past and future remediation costs and loss of use and enjoyment.

**COUNT V**

**STATUTORY NUISANCE**

**17 M.R.S. §§ 2701 AND 2802**

137. Plaintiffs repeat and incorporate the preceding paragraphs as if fully set forth here.

138. Section 2701 authorizes a person injured in comfort, property, or enjoyment of an estate by a common and public or private nuisance to maintain a civil action for damages.

139. Section 2802 identifies as a nuisance the corrupting or rendering unwholesome or impure of the water of a river, stream, pond, or aquifer.

140. Through the conduct alleged above, Defendants created, caused, continued, and substantially participated in contamination that corrupted or rendered unwholesome or impure groundwater and aquifers affecting Plaintiffs' properties.

141. Plaintiffs have been specially injured in their property and enjoyment of their estates and are entitled to damages under Maine's nuisance statutes for reasonable remediation costs and loss of use and enjoyment.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs request judgment in their favor and against Defendants, jointly and severally to the extent permitted by Maine law, or otherwise allocated as the evidence and law require, awarding:

142. Past and future reasonable costs to investigate, characterize, contain, treat, remove, replace, monitor, and otherwise remediate PFAS contamination of Plaintiffs' properties, including reasonable operation and maintenance costs;

143. Compensatory damages for past and future loss of use and enjoyment of Plaintiffs' properties;

144. Prejudgment interest under 14 M.R.S. § 1602-B and post-judgment interest as allowed by law;

145. Taxable costs and other costs recoverable by law; and

146. Such other relief consistent with the limited property-damage remedies pleaded in this Complaint as the Court deems just and proper.

**For avoidance of doubt,** Plaintiffs do not seek damages in this action for personal injury, emotional distress, medical monitoring, or diminution in market value.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 4, 2026

Respectfully submitted,

/s/ *Alexis Chardon*

Alexis Garmey Chardon, Esq., Bar No. 5932
**GARMEY LAW**
482 Congress Street, Suite 402
Portland, Maine 04101
Telephone: (207) 899-4644
achardon@garmeylaw.com
*Local Counsel for Plaintiffs*

Russell Abney
**WATTS GUERRA LLP**
State Bar No. 00818100
811 Barton Springs Rd., Ste. 725
Austin, TX 78704
Telephone: (512) 479-0500
Telephone: (210) 448-0500
Facsimile: (512) 479-0502
russ@wattsllp.com
*Lead Counsel for Plaintiffs, Pro Hac Vice Forthcoming*